*10b*

SUPERIOR COURT
FOR CRIMINAL BUSINESS
SUFFOLK COUNTY
**COMMONWEALTH OF MASSACHUSETTS**
04 FEB -3  PM 4: 07

**SUFFOLK, ss.**                                        **SUPERIOR COURT**
FILED                                                   **CRIMINAL NO. 01-10384**
JOHN A. NUCCI
CLERK/MAGISTRATE

**COMMONWEALTH**

**v.**

**LEON ROBINSON**


**MEMORANDUM, FINDINGS AND ORDERS
ON DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE**

**BACKGROUND**

The defendant, Leon Robinson ("Robinson"), is charged with violation of G. L. c. 265,

§ 1, for the murder of Recardo Robinson on February 21, 2001, at 1587 Commonwealth Avenue

in Boston, Massachusetts. Robinson is also charged with violation of G. L. c. 269, § 10(a),

unlawful possession of a firearm.

This matter is before the court for decision on several motions to suppress evidence filed

by the defendant.

Robinson moves to suppress all evidence seized from his apartment, No. 53, located at 27

Spring Street, West Roxbury, Massachusetts ("Spring Street"), alleging that the Boston Police

conducted a warrantless search of his apartment shortly after his arrest on February 21, 2001.

Robinson also moves to suppress the evidence recovered from his apartment pursuant to the

execution of a search warrant issued by the Hon. Anne Chaplin in the early morning hours of

February 22, 2001. Robinson claims that the search warrant affidavit and application failed to

establish probable cause to believe that evidence of a crime would be found at apartment No. 53;

that the search warrant was overbroad; that law enforcement's search of the apartment exceeded

the parameters of the search warrant that had been obtained; and that the search warrant was

invalid due to the judge's failure to affix her signature to it.

Robinson also claims that the Boston Police search warrant affiant made material misrepresentations or mistakes in his February 21, 2001 affidavit, rendering the search warrant invalid pursuant to Franks v. Delaware, 438 U.S. 154 (1978) and Commonwealth v. Amral, 407 Mass. 511 (1990).

Robinson moves to suppress several photographic identifications made by civilian witnesses on the ground that the procedures utilized by law enforcement agents were unnecessarily and impermissibly suggestive.

Finally, Robinson moves to suppress statements he made while in Boston Police custody after his February 21, 2001 arrest, on the ground that the police failed to promptly provide him notice of his right to make a telephone call pursuant to G. L. c. 276, § 33A.

Hearings on all of these matters were conducted on July 14, 15, and 16, 2003. Witnesses called to testify included the following:

    1.    Javier Soto

    2.    Raymond Shaw, Jr.,

    3.    Timothy O'Sullivan, Boston Police

    4.    Arthur J. O'Connell, Boston Police

    5.    Joseph Murray, Boston Police

    6.    Garrett Mitchell, Boston Police

    7.    Michael Primm, Boston Police

    8.    John Martel, Boston Police

    9.    James J. Wyse, Boston Police

## FACTUAL FINDINGS

Gleaned from the extensive sworn testimony over a three days hearing, the court makes the following factual findings:

On the afternoon of February 21, 2001, Ricardo Robinson ("the deceased") suffered multiple gunshot wounds while in a barbershop located at 1587 Commonwealth Avenue ("the shop") in Boston, Massachusetts. After the shooting, multiple members of the Boston Police were summonsed to the barbershop in response to a 911 call describing a shooting.

Joseph A. Murray ("Murray"), a Boston Police patrolman for approximately fifteen years, was in uniform and on duty on the afternoon of February 21. At approximately 4:00 PM, he monitored a radio call concerning a shooting at the shop. Arriving at the shop at approximately 4:40 PM, Murray spoke to Boston officers Adams ("Adams") and Fleming ("Fleming"). Adams informed Murray of a witness named Dorinda Carter ("Carter") who had related that as she pulled up to the shop to park, she saw a late-20s black male, with short, braided hair, wearing black pants, a brown leather coat with a fur collar, and a gold-colored cross, shoot someone and then leave the interior of the shop. Murray conducted some brief interviews with individuals in the vicinity of the shop.

Boston Officer Timothy O'Sullivan ("O'Sullivan") also heard the radio dispatch, and headed to the shop. When he arrived at the shop, O'Sullivan saw other police cruisers at the scene, and a gathering of non-police individuals gathered around the shop. O'Sullivan made a general announcement to the civilians, seeking informational assistance.

O'Sullivan spoke to an individual named Maurice McIntosh ("McIntosh"), who provided a description of the shooter: black male, approximately 34-38 years old, approximately five feet,

five inches tall, with a moustache and goatee, wearing a brown leather coat with a fur collar.[1]

McIntosh also told O'Sullivan that there might be another person still inside the shop, possibly in the shop's basement. McIntosh indicated that this person's name was "James," who was not the shooter.

O'Sullivan and a Boston Police Detective named "Brooks" entered the shop's basement area, with guns drawn. They announced their entry into the basement, but received no verbal response. The officers decided to perform a protective sweep of the cellar, each checking one side thereof. During the protective sweep, Brooks located an individual, later identified as James Rainey ("Rainey"), and placed him into handcuffs for safety reasons.

Detective Arthur O'Connell ("O'Connell"), who was in plain clothes and working alone that afternoon, responded to the 911 call by driving over to 1587 Commonwealth Avenue shortly after 4:00 PM. on February 21. Upon arrival, he set out a security perimeter around the shop so that potential evidence might be preserved. He also observed that a male individual was laying face down on the shop floor.

During the course of his participation in the shooting investigation at the scene and at Boston Police's District 14 headquarters, O'Connell spoke to Rainey, learning that earlier in the day, the deceased had been engaged in conversation with a black male inside the shop. Rainey knew the deceased as a "social friend." Rainey further told O'Connell that the black male drew a firearm and shot the deceased. Rainey provided a description of the shooter: a black male, approximately 38 years old, approximately 5' 5" tall, weighing approximately 155 pounds.

---

[1]    O'Sullivan also spoke to Carter, obtaining a physical description of the shooter, and a description of the weapon: a long, black-barreled handgun. Carter also told Sullivan that the shooter left the shop in a calm fashion, heading for the nearby housing projects.

Rainey described the shooter's clothing as consisting of a black three-quarter length leather jacket, dark trousers, and tan boat shoes. Rainey also told O'Connell that after the shooting, he ran into the shop's cellar to hide from the gunman.

At District 14, apart from and after he had conducted his interview with Rainey, O'Connell also spoke Carter. Carter informed O'Connell that as she was pulling up to the shop in her car, she saw a man using his right hand to point a gun at a man in the shop. Carter saw the weapon fire several times. Carter moved her car from in the front of the shop, made a u-turn, and made a 911 call to report the shooting incident.

Carter described the shooter as a black male unknown age, approximately 5' 6" tall, of medium build and dark complexion, wearing a black leather jacket.

Boston Police Detective Garrett Mitchell ("Mitchell") remained at the Boston District 14 police station after the radio report of a firearm shooting was received. Later in the afternoon of February 21, based on descriptive information he received from Rainey and from McIntosh,[2] Mitchell prepared a computerized photographic array drawn from the memory cache of the District 14 arrestees. Mitchell's computer was able to generate one hundred-six (106) photographs of male individuals.

Separately, and out of the presence of each other, Rainey and McIntosh viewed the computer generated photographic array on a computer screen. The photographs are presented in a way that allows a witness to scroll backward and forward through the assembled photographs if they wish to do so. Photographs of one individual appear on the screen at a time. No names of

---

[2]     The information input into the system is contained in a two-page Boston Police "Query Matching report" that was admitted at hearing as Exhibit No. 2.

individuals are visible on the screen as the witness scrolls through the photographs.

In this instance, when Rainey was provided the opportunity to view the array, he was first advised that an individual may or may not be within the group of 106 photographs. Mitchell also explained how the computer mouse is used to advance or reverse the photographic scroll.

Rainey stopped scrolling at photograph No. 10 in the computer generated array, stating that the photograph depicted the barber shop shooter. Photograph No. 10 was later determined to be Robinson's photograph.

McIntosh was then brought into the viewing room, and he, too, was advised in the same way that Rainey had been advised. McIntosh then scrolled through the assembled photographs, also selecting photograph No. 10 as depicting the armed assailant.

Boston Police Homicide Detective Michael Primm ("Primm") was also involved in the ongoing investigation. He went to the shooting scene on February 21, and gathered investigative information from both uniformed officers and detectives. After spending approximately 35-40 minutes at the shop, Primm went to District 14. There, he spoke to Rainey, and obtained an account of what had occurred at the shop. Rainey told Primm that the victim and Robinson had been engaged in an argument before the shooting took place. Rainey described the shooter as being approximately 5' 6" tall; aged approximately 38 years old; with a dark complexion; missing some teeth; having short hair; having a stocky build; and walking with a limp as a result of one of the shooter's legs being shorter than the other.

In separate procedures for each individual witness, Primm showed Rainey and McIntosh printed versions of the photographic arrays. Primm's presentations took place after Rainey and McIntosh had identified the defendant's photograph from the computer generated array. Before

each witness viewed the printed arrays, Primm advised them not to be too concerned with hair length or style because such things could vary from time-to-time. Further, Primm advised the witnesses not to be overly concerned with complexion coloring because the photographs' computerized genesis might affect skin tone. Primm suggested that the witnesses focus on the face depicted in each photograph. Once again, Rainey and McIntosh selected the defendant's photograph from among those contained in the photographic arrays.[3] Each witness signed and circled the selected photograph.

Primm did not interview Carter on February 21, nor did he show any photographic array to her on that date.

Primm subsequently went to a Jetty Court address believed to be the residence of the defendant. Instead, Primm met with Robinson's mother, who invited him and accompanying officers O'Connell and Detective Mitchell into the home. Robinson's family members told Primm that they had been in telephone contact with the defendant, and Primm was thereafter able to contact him, as well. Primm informed Robinson that he needed to speak to him concerning the shooting that had occurred at the shop. Robinson inquired, "What do you want to talk to me about?" or words to that effect. Primm and Robinson then agreed to meet face-to-face at a L'il Peach convenience store in West Roxbury.

Later, Primm and other Boston Police members went to the L'il Peach store. A one-person civilian camera crew ("cameraman"), employed by a national television network, was accompanying Det. James Wyse ("Wyse") during his duties that evening. This cameraman accompanied Wyse to the L'il Peach location on February 21, 2001, and was also present at

---

[3]    The arrays were admitted in to evidence as Exhibit Nos. 4 and 5, respectively.

Spring Street when a search was conducted during the early morning hours of February 22, 2001.

Upon meeting Robinson, Primm advised him of his rights per *Miranda*, reading those rights from a printed card. Primm did not ask Robinson any questions at the L'il Peach location. No weapons were discovered on Robinson's person at the arrest scene. Robinson was transported to Boston Police Homicide Headquarters. Primm and other investigating police officers seized some of Robinson's clothing, including a leather jacket.

The Spring Street apartment in West Roxbury was secured by Boston Police officers while other investigators sought a court authorized search warrant for the premises. Access to the apartment was restricted during the wait for the warrant.

Javier Soto ("Soto") is an eight-year Boston Housing Authority ("BHA") employee. Soto, a custodian, usually carries a pager and two-way radio as part of his ongoing managerial and emergency service duties with the BHA. As part of his employment, Soto also carries master keys that allow access to BHA properties, including the structure on Spring Street.

At approximately 10:40 PM on the evening of February 21, 2001, Soto received a telephonic page, which directed him to call the BHA Answering Service. Within a few minutes, Soto responded to the page by contacting the answering service telephone number. He was directed to Spring Street to assist in opening the door of a second-floor apartment, No. 53. Soto was informed that police officers were waiting for him at Spring Street. Soto knew that No. 53 was the apartment in which "Leon" resided, for Soto had performed some repairs in the apartment in the past.

Upon his arrival at Spring Street, Soto saw several Boston Police cruisers outside, and he encountered two plain clothed officers standing on the stairwell leading up to the second floor

after he entered the building.

The officers told Soto that they did not need him to open the door, that they were "all set," or words to that effect. From the stairwell, Soto saw what appeared to be a video camera operator walking down the second-floor hallway. Soto was unable to see the defendant's apartment door from where he stood, so was incapable of knowing whether No. 53's door was open or closed, or whether or not anyone was inside the apartment. While he was on the premises, Soto never saw anyone, including the camera person, inside the apartment. Soto remained in the building for approximately three-to-four minutes, then left the area.

At the Homicide Unit headquarters, Robinson was taken into an approximate five-foot by eight-foot interview room. Handcuffs that had been placed on Robinson for transport purposes, were removed. A tape recorder was placed in the room. Primm verbally repeated the warnings per *Miranda* utilizing a typewritten form provided to the defendant. After each individual warning was stated (and tape-recorded), Robinson verbally indicated his understanding of each, and he signed the form.[4] Primm did not specifically inform Robinson of "a right to make a telephone call."

At the suppression hearing, Wyse testified that prior to 2001, it was not a Boston Police policy to advise an arrested individual that they could have the opportunity to make a telephone call within one hour, but he acknowledged that the right to a telephone call within an hour of arrest did exist. Forms utilized by the Boston Police Department in 2003 contain information regarding the right to make a telephone call.

During the course of the interview, Robinson showed no health or mental disabilities.

---

[4]     The form has not been located as of the suppression hearing sessions.

Primm's hearing testimony describes Robinson as being articulate, responsive to questions, and as exhibiting no impairments due to alcohol or other substances.

During the interview, Primm suggested that Robinson would have an opportunity to contact someone for advice on what his (Robinson's) best course of action might be, under the circumstances. At approximately 12:39 AM, Robinson telephoned his mother, then agreed to continue the tape-recorded interview.

Also taking place during the evening of February 21, 2001, and into the early morning hours of February 22, was Boston Police Detective John Martel's ("Martel") preparation of a search warrant affidavit and application for Spring Street. Earlier, Martel had been at the Spring Street location, obtaining the necessary descriptive information for inclusion into the application and affidavit. While at Spring Street this first time, Martel instructed the on-scene officers to secure the apartment premises, and he ordered them not to go into the apartment themselves, or to allow any other individuals into the apartment.

Additional information regarding the shooting incident, and the subsequent police investigation of the case were gleaned from Martel's conversation with other investigating officers, and entered into his search warrant affidavit and application.

After midnight on February 22, 2001, Martel drove to the Cambridge, Massachusetts, home of on-duty emergency judge, Justice Anne Chaplin ("Judge Chaplin"). Judge Chaplin read the affidavit and authorized issuance of the search warrant for Spring Street. The search warrant affidavit bears the signature of the judge and Martel. The application for the search warrant bears the signature of the Judge Chaplin and Martel. The search warrant itself failed to include the judge's signature.

After court authorization was obtained, the Boston Police initiated the search of Spring Street at approximately 3:15 AM on February 22. Among those present during the authorized search were Primm, Wyse, Martel, Mitchell, and a Boston Police Identification Technician named Charles Hardy, who photographed the search and seizure efforts of the police. Seized pursuant to the search were: a Ralph Lauren black-and-white plaid shirt; black denim pants; a black-and-white colored "do" rag from a bedroom night stand; pair of black-colored sneakers that were found resting next to a bureau; a silver neck chain with a cross retrieved from a table; and a police scanner. At the time that the search was being conducted, Martel became aware of that a neck chain and/or cross might be of evidentiary value, though he was not specifically aware of its possible existence or relevance at the time he authored the search warrant affidavit.

After the premises search was concluded at approximately 4:00 or 4:30 AM, Martel and Wyse returned to the Boston Police Homicide Unit headquarters. While at headquarters in the early morning hours of February 22, Martel first noticed that Judge Chaplin had not signed the search warrant relating to Spring Strees. At the suggestion of Wyse, Martel also came to believe that affidavit information attributed to an individual, "Lamar Shanks" ("Shanks"), on Pages Six and Seven of the search warrant affidavit, should have, instead, been attributed to James Rainey.

Martel returned to Judge Chaplin with the unsigned search warrant, which was then executed by the judge.

Martel also informed Judge Chaplin of what he then-believed to be an erroneous attribution on information ("Shanks" instead of "Rainey") as denoted on Pages Six and Seven of his original affidavit. Martel presented Judge Chaplin with an amended affidavit, that reflected the Shanks-for-Rainey change. Martel also authored a Boston Police Incident Report that

describes the aforementioned errors in: (1) the Judge's failure to sign the search warrant; and (2) the then-believed erroneous Page Six and Page Seven attribution of information.

In preparation for his Motion to Suppress testimony on July 15, 2003, Martel once again reviewed copies of the "original" and "amended" search warrant affidavit relating to the investigation. At the suppression hearing, Martel testified that he believes that, in fact, the original affidavit *was* accurate on Pages Six and Seven insofar as it credited information related to the police by witness Shanks.

On February 25, 2001, Martel composed and presented a one-page photographic array to show to Shanks. The array contained a photograph of the defendant, in position No. 5 among the twelve photographs that comprised the array. Martel advised Shanks to take a look at the photographs to determine if he (Shanks) recognized any one as being an individual in the barber shop. Shanks drew a circle around photograph No. 5, and placed his initials nearby. Shanks also affixed his signature upon the photograph array. In his own hand, Martel erroneously entered the date of "2/24/01" rather than the correct date of "2/25/01," a designation that appears the top of the one-page document.[5]

On February 26, 2001, Martel showed a one-page photographic array to Dorinda Carter. In this array, designated with the gallery number "0149," the defendant's photograph was placed in location No. 7. After directions to take a look at the photographs to determine if she (Carter) recognized any one as being an individual she saw at the barber shop on the afternoon of February 21, 2001, Carter indicated that she saw two photographs that "closely resembled" the man: Nos. 3 and 7. Carter drew a circle around photograph Nos. 3 and 7. Both Carter and

---

[5] See Suppression Hearing Exhibit No. 10, admitted without objection.

Martel affixed their signatures to the one-page document.[6]

On March 4, 2001, Martel showed a freshly prepared photographic array arrangement, that is to say, an array composed of the same photographs that Martel had shown to Carter (gallery #0149), to an individual named Eddie Bishop ("Bishop").  After the same directions that were given to Carter, Bishop selected the photograph No. 7, the photograph of the defendant.[7]

## DISCUSSION

### The Defendant's Franks/Amral Objection (Paper #81)

Robinson contends that the search warrant affidavit submitted in support of the request for search of the defendant's apartment omitted material information.  Specifically, Robinson asserts that the search warrant affiant failed to include information that Boston Police officers entered the defendant's 27 Spring Street, West Roxbury, Massachusetts, apartment on February 21, 2001, and conducted a search therein many hours before securing the court's authority.  Robinson also claims that the Boston Police and/or a civilian television film crew accompanying the Boston Police were inside videotaping the interior.  The Commonwealth denies that the Boston Police conducted any unauthorized search of the premises, and that no one videotaped the premises' interior without proper court authorization.

In support of his assertion, the defendant called Soto to testify.  Soto's testimony clearly establishes that he never was in a position to even see the defendant's apartment door, much less see whether or not anyone – including a camera person – was inside of the apartment.

Robinson has failed to produce any credible evidence that the Boston Police ever entered

---

[6]    See Suppression Hearing Exhibit No. 11, admitted without objection.

[7]    See Suppression Hearing Exhibit No. 12, admitted without objection.

his apartment before procuring a court authorized search warrant. Indeed, the credible evidence produced by the Commonwealth affirms that there was no entry or search of Robinson's apartment prior to the issuance of the search warrant therefor.

Accordingly, Robinson's motion to suppress evidence on the ground that there was a warrantless search of Spring Street must fail.

### Supplemental Motion to Suppress Search of the Apartment (Paper #67)

Robinson asserts on information and belief that although the police obtained a search warrant at approximately 3:15 a.m. on February 22, 2001, that they actually entered his apartment and began searching, and possibly videotaping, at approximately 10:30 p.m. As such, he argues that the search of his apartment was a warrantless search for which no exception exists and the items seized from the apartment should be suppressed as "fruit of the poisonous tree." As stated above, the Commonwealth denies that the Boston Police conducted any unauthorized search of the premises, and that anyone videotaped the premises' interior without proper court authorization.

Once again Robinson relies upon Soto's testimony to support his assertion. However, as previously detailed, the testimony makes clear that Soto was never able to see the defendant's apartment door, much less see whether or not anyone–including a camera person–was inside the apartment. Once more, Robinson has failed to produce any credible evidence that the Boston Police ever entered his apartment before procuring a court authorized search warrant. Furthermore, the credible evidence produced by the Commonwealth affirms that there was no entry or search of Robinson's apartment prior to the issuance of the search warrant therefore.

Accordingly, Robinson's motion to suppress evidence on the ground that there was a

warrantless search of Spring Street must fail.

### Motion to Suppress Defendant's Coat (Paper #52)

Robinson argues that the seizure of his leather coat was illegal because it was done without Robinson's consent, without a warrant, and under no other exception to the warrant requirement. The Commonwealth asserts that the seizure was proper as a search incident to arrest under G.L. c. 276,.§ 1, which provides in relevant part:

> A search conducted incident to an arrest may be made only for the purposes of seizing fruits, instrumentalities, contraband and other evidence of the crime for which the arrest has been made, in order to prevent its destruction or concealment;

G.L. c. 276, § 1.

This section "requires the exclusion of evidence (not otherwise admissible) of an unrelated crime found during a search incident to a lawful arrest unless the search was conducted to gather evidence of the first crime or to look for weapons." Commonwealth v. Madera, 402 Mass. 156, 159 (1988). However, this section does not restrict the "admissibility of evidence of the crime for which the defendant was lawfully arrested that was found during a search incident to arrest." Id. The justification for this type of search "rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial." See Commonwealth v. Thomas, 429 Mass. 403, 409 (1999), quoting United States v. Robinson, 414 U.S. 218, 234 (1973). However, the police officers must have probable cause to believe that the evidence is related to the crime for which the arrest was made. Commonwealth v. Robles, 423 Mass. 62, 66 (1996) ("To seize the coat incident to arrest, the police must have had probable cause to believe that the coat was connected to the crime.").

Furthermore, the search must be made contemporaneously with the arrest. See

-15-

Commonwealth v. Alvarado, 420 Mass. 542, 544 (1995).  However, the search may be made after the accused arrives at the police station.  See Commonwealth v. Thomas, 429 Mass. at 409; see also United States v. Edwards, 415 U.S. 800, 803 (1974), overruled on other grounds, United States v. Chadwick, 433 U.S. 1, 15 (1977) ("searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention").  As such, "[o]nce a defendant has been arrested and is in custody, clothing that constitutes evidence may be taken from him."  Commonwealth v. Gliniewicz, 398 Mass. 744, 750 (1986).

In the present case, the police officers searched Robinson at the arrest scene and found no weapons on his person.  Robinson was then transported to Boston Police Homicide Headquarters where Primm and other investigating police officers seized some of Robinson's clothing, including the leather jacket.  Although the hearing testimony does not establish exactly when the police officers seized the leather jacket, there is evidence that it was retrieved at or near the time that Robinson arrived at the police station; therefore, it was a timely seizure incident to arrest.  See Commonwealth v. Thomas, 429 Mass. at 409.  Furthermore, because various witnesses had described the shooter as wearing a brown leather coat, the officers had probable cause to believe that the jacket was connected to the crime for which Robinson was lawfully arrested.  As such, the leather jacket was lawfully seized incident to Robinson's arrest, and Robinson's motion to suppress must be denied.

**Motion to Suppress Items Seized Pursuant to Search Warrant (Paper #53)**

*Search Warrant Affidavit and Application Failed to Establish Probable Cause*

In order to establish probable cause for a search warrant, the supporting affidavit must "contain sufficient information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that the items reasonably may be expected to be located in the place to be searched at the time the search warrant issues." Commonwealth v. Wilson, 427 Mass. 336, 342 (1998). In reviewing the four corners of the warrant application, the court may consider only those factors revealed on the face of the affidavit and any reasonable inference therefrom. See Commonwealth v. Blake, 413 Mass. 823, 827 (1992). The affidavit should be read in an ordinary, common-sense manner without hypercritical analysis. See Commonwealth v. Allen, 406 Mass. 575, 578 (1990). Furthermore, "[t]he affidavit need not convince the magistrate beyond a reasonable doubt, but must provide a substantial basis for concluding that evidence connected to the crime will be found on the specific premises." Commonwealth v. Donahue, 430 Mass. 710, 711 (2000). The defendant bears the burden of showing that evidence seized pursuant to a search warrant was illegally obtained. Commonwealth v. Taylor, 383 Mass. 272, 280 (1981); Commonwealth v. Fancy, 349 Mass. 196, 202 (1965).

Robinson argues that there was no evidence presented in the affidavit which substantiates that he had been at his residence at 27 Spring Street in West Roxbury after the shooting. He asserts that the police failed to establish a time line which could have permitted the judge to make a reasonable inference that Robinson had the opportunity to hide evidence of a crime at his apartment on Spring Street. Consequently, he contends that since the affidavit fails to establish a reasonable inference that he could have hidden evidence from the crime in his apartment, the judge lacked probable cause to issue a warrant for the defendant's apartment.

-17-

Information establishing that a person is guilty of a crime does not necessarily constitute probable cause to search the person's residence. See Commonwealth v. Cinelli, 389 Mass. 197, 213, cert. den., 464 U.S. 860 (1983); Commonwealth v. Olivares, 30 Mass. App. Ct. 596, 600 (1991). However, the nexus between the items to be seized and the place to be searched may be based on direct observation or may be found in the type of crime, the nature of the items, and the normal inferences as to where a criminal would be likely to hide contraband. Commonwealth v. Cinelli, 389 Mass. at 213; Commonwealth v. Olivares, 30 Mass. App. Ct. at 600. Where the items sought are "durable, of continuing utility to the defendants, and it [is] reasonable to expect that they would be kept at home, particularly as they are not inherently incriminating to possess," a magistrate could reasonably infer that the evidence sought under the warrant might be in the defendant's home after a crime. Commonwealth v. James, 424 Mass. 770, 778 (1997) (finding probable cause to search defendant's residence for knives, sneakers, clothing, and face masks); Commonwealth v. Wilson, 427 Mass. 336, 343 (1998); Commonwealth v. Burt, 393 Mass. 703, 715-716 (1985) (coins, tools, clothing, keys, and bank books).

In the present case, the search warrant for the defendant's home covered a black revolver and ammunition, black slacks, and a black and white Polo long sleeve shirt. The affidavit provided detailed information from named witnesses. It also stated that witnesses described the weapons used and the suspect's clothing. Not only were the items to be seized durable and of continuing utility to Robinson, but they were not inherently incriminating to possess. The information in the affidavit provided a substantial basis for the judge to conclude that this evidence, which was connected to the crime, would be found in Robinson's apartment.

Accordingly, Robinson's motion to suppress evidence seized pursuant to the search

warrant due to a lack of probable cause must fail.

*Search Warrant was Overbroad*

Robinson argues that the affiant's statement that the shooter was wearing a polo shirt and black pants is unsubstantiated because it is not attributed to any individual witness. Thus, he contends that without the statement the scope of the warrant was overbroad as the police sought clothing for which they had no credible factual evidence to support the judge's issuance of a warrant for those particular items.

Article 14 of the Massachusetts Declaration of Rights requires warrants to be "accompanied with a special designation of the persons or objects of search, arrest, or seizure." "The particularity requirement serves as a safeguard against general exploratory rummaging by the police through a person's belongings." Commonwealth v. Balicki, 436 Mass. 1, 7 (2002). It is important to note, however, that "affidavits for search warrants should be interpreted in a commonsense and realistic fashion, and read as a whole, not parsed, severed, and subjected to hypercritical analysis." Commonwealth v. Donahue, 430 Mass. at 711 (internal quotations omitted).

Here, the affidavit states with particularity the items to be seized: "pair of black slacks, a black and white Polo long sleeved shirt, a black revolver, any and all ammunition . . . ." Furthermore, as stated supra, the supporting affidavit attributed this detailed information to descriptions of the shooter that were given by named witnesses. Thus, by reading the affidavit in a realistic fashion, the items to be seized were both substantiated with credible factual evidence (witnesses' descriptions) and stated with particularity.

Accordingly, Robinson's motion to suppress the evidence seized pursuant to the search

warrant on the ground that the warrant was overbroad must fail.

*Scope of the Apartment Search*

Robinson argues that the executing officers illegally seized evidence which was outside the scope of that permitted by the warrant. He argues that the search warrant issued for the apartment was specific in delineating what evidence could be seized during its execution, and that by seizing items not specifically listed, the police exceeded the scope of the warrant in violation of the Fourth Amendment and Article XIV rights.

The Commonwealth concedes that the warrant did not specifically authorize the seizure of the police scanner, sterling cross and chain, and "do" rag. However, it argues that the seizure of these items was lawful under the plain view exception to the warrant requirement. This court agrees.

Where a search or seizure is conducted outside of the scope of a valid search warrant, it is presumed to be unreasonable. See Commonwealth v. Antobenedetto, 366 Mass. 51, 57 (1974). The Commonwealth has the burden of proving that the warrantless search and seizure falls within an exception to the warrant requirement, such as the plain view doctrine. See id. "Under [the plain view] doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." Commonwealth v. D'Amour, 428 Mass. 725, 730-731 (1999), quoting Commonwealth v. Santana, 420 Mass. 205, 211 (1995). "In order for the plain view doctrine to apply, '[o]ur cases also have required that the police come across them inadvertently.'" Commonwealth v. Balicki, 436 Mass. at 9, quoting Commonwealth v. D'Amour, 428 Mass. at 731. "[T]he inadvertence requirement means only

that the police lacked probable cause to believe, prior to the search, that specific items would be discovered during the search." <u>Balicki</u>, 436 Mass. at 10.

In the present case, the police officers were lawfully inside the apartment and had lawful access to Robinson's bedroom pursuant to the search warrant. These items were in plain view when they were seized. The officers seized the "do" rag from a bedroom night stand, the silver neck chain with a cross from a table, a police scanner, and the sneakers from the floor alongside a bureau. Furthermore, the officers came across the items inadvertently, because it was not until the time that the search was being conducted, that Martel became aware that a neck chain and/or cross might be of evidentiary value, though he was not earlier aware of its possible existence or relevance. Because the Commonwealth has met its burden of proving that the warrantless seizures fell within the plain view exception, Robinson's motion to suppress the "do" rag, black sneakers, silver chain and cross, and police scanner must fail.

*Search Warrant was Invalid due to Judge's failure to Affix Signature*

Mere ministerial errors are not enough to nullify a search warrant. <u>Commonwealth</u> v. <u>Pellegrini</u>, 405 Mass. 86, 88, cert. den., 493 U.S. 975 (1989). In addition, "a failure to sign an otherwise valid warrant, in a situation where there is no question that the judge intends to issue the warrant, should be deemed a ministerial defect which does not invalidate the warrant." <u>Id.</u> "Where, as here, there is no dispute that the judge intended to issue the warrant, and the judge signed the officer's affidavit, the failure to sign the warrant 'is no more than a clerical error.'" <u>Id.,</u> quoting <u>Commonwealth</u> v. <u>Truax</u>, 397 Mass. 174 , 182 (1986).

In the present case, Judge Anne Kenney Chaplin's failure to sign the warrant was merely a clerical error. In fact, Judge Chaplin subsequently signed an affidavit in which she made clear

-21-

that there was probable cause to issue the warrant,[8] and that the omitted signature was merely an oversight. Thus, there was no question that the judge intended to issue the warrant, and the warrant will not be invalidated due to this ministerial defect.

Robinson further argues that Judge Chaplin not only failed to sign the warrant, but also failed to properly weigh the facts in her determination that probable cause existed. He contends that it is questionable whether she did, in fact, perform a substantive probable cause analysis before issuing the warrant, thus the search warrant should be deemed void. As stated supra, the supporting affidavit contained sufficient information for Judge Chaplin to determine that there was probable cause to issue the warrant for Robinson's apartment. See Wilson, 427 Mass. at 342. Because there was probable cause to issue the search warrant, the defendant's argument here is not persuasive.

Accordingly, Robinson's argument that the search warrant is invalid due to the judge's failure to affix her signature must fail.

### Motion to Suppress Statements under G. L. c. 276, §3A (Paper #54)

Robinson contends that the statement he made to the Boston Police Department should be suppressed because the detectives did not give him notice of his statutory right to use the telephone. General Laws chapter 276, § 33A provides that:

> [t]he police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the

---

[8]    Affidavit of the Honorable Anne Kenney Chaplin, March 8, 2001, para. 5 ("I reviewed carefully all three documents in Detective Martel's presence.") See also para. 6 ("After completing my review of the documents, I concluded that probable cause existed for the issuance of the Search Warrant, based upon the information that was provided to me in Detective Martel's affidavit in support of the Application for Search Warrant.")

arrested person to communicate with his family or friends, or to arrange for
release on bail, or to engage the services of an attorney. Any such person shall be
informed forthwith upon his arrival at such station or place of detention, of his
right to so use the telephone, and such use shall be permitted within one hour
thereafter.

G.L. c. 276, § 33A.

Although the statute does not prescribe an expressed penalty for violation, Massachusetts case

law makes clear that "in order to make the statute an effective piece of legislation, courts should

suppress unfavorable evidence gained as a result of denying a defendant the right to use a

telephone." Commonwealth v. Jones, 362 Mass. 497, 502 (1972); see also Commonwealth v.

Alicea, 428 Mass. 711, 715-16 (1999). As such, "unfavorable evidence gained as a result of an

intentional deprivation of a defendant's right to make a telephone call pursuant to G.L. c. 276, §

33A should be suppressed." Commonwealth v. Johnson, 422 Mass. 420, 429 (1996). However,

where the evidence was obtained as a result of an unintentional deprivation of a plaintiff's right

to make a telephone call, suppression is not required. See Commonwealth v. Johnson, 422 Mass.

at 429 ("We have not extended the policy to unintentional deprivations by the police"), and cases

cited therein.

In arguing that his incriminating statements should be suppressed, Robinson principally

relies on Commonwealth v. Alicea, 55 Mass. App. Ct. 505 (2002), wherein the court held that

where the police intentionally failed to inform the defendant of his statutory right to use the

telephone until he made an incriminating statement, the subsequent incriminating statements

were "fruit of the poisonous tree," and thus subject to suppression. In that case, the defendant

arrived at the police station at about 10:30 a.m., and was identified on a store video tape at

approximately 11:30 a.m., at which point he was a murder suspect and was no longer free to

-23-

leave the station. The court concluded that at 11:30 a.m. the defendant was officially in the custody of the police, and the provisions of G.L. c. 276, § 33A attached. Id. at 510. It was not until 10:20 p.m., three hours after booking and approximately eleven hours after the defendant had first been considered a suspect in the murder, that the police read the defendant a multiple rights form, which included, for the first time, information concerning the defendant's statutory right to a telephone call. In concluding that the statutory violation was intentional, the Appeals Court highlighted the fact that the defendant was not informed of his statutory right until eleven hours after his right attached, and that the printed multiple rights form given to the defendant had the suspect's § 33A rights printed on it, which, along with the officers' 70 years of aggregate experience was an indication that the officers were aware of this statutory right. Id. at 510.

The present case, however, is distinguishable from the Appeals Court decision in Alicea. As compared to the eleven hour time period in that case, here the officers waited no longer than two hours to inform Robinson of his right to use the telephone.[9] Although forms utilized by the Boston Police Department in 2003 contain information regarding the right to make a telephone call, the rights form used by Primm and signed by Robinson did not contain information regarding the defendant's § 33A rights. Thus, unlike Alicea, it is not apparent that the Primm was aware of the statute's provisions in such detail that this court may find that he purposefully failed to inform Robinson within an hour of the arrest. Boston Officer Wyse testified that prior to 2001, it was not a Boston Police policy to advise an arrested individual that they could have

---

[9] The arrest report designates that Robinson was arrested and brought into the Homicide Unit at 10:45 p.m. on February 21, 2001. At approximately 12:39 a.m. Robinson telephoned his mother, then agreed to continue the tape-recorded interview. The "rough draft" transcript of the interview was submitted, by agreement of the parties, for the court's consideration. This rough draft suggests that the interview began at approximately 10:52 p.m. on Feb. 21, 2001.

the opportunity to make a telephone call within one hour, but he recognizes that the right to a telephone call within an hour of arrest did exist at that time. Nevertheless, Primm's actions do not manifest an intent to deprive Robinson of his statutory right to a telephone call.

Accordingly, Robinson's motion to suppress statements under G.L. c. 276, § 33A fails.

## Motion to Suppress Photographic Identifications (Papers # 49, 68 & 83)

Robinson moves to suppress several photographic identifications made by civilian witnesses on the ground that the procedures utilized by law enforcement agents were unnecessarily and impermissibly suggestive. Through counsel's affidavit, Robinson asserts that after Mr. Shanks picked out Robinson's photograph from an array, Shanks was then shown a lone photograph of the defendant and was asked to identify him. However, no evidence was presented at the hearing that suggests Shanks was shown anything other than the twelve photograph array. As such, this argument is without merit and the motion to suppress the photographic identifications must be denied.

### ORDER

For the aforementioned reasons, it is hereby **ORDERED** that the defendant's motions to suppress seized evidence, photographic identifications, and statements are **DENIED**.

Joseph M. Walker III
Associate Justice of the Superior Court

DATE: 1/21/04

# Commonwealth of Massachusetts
## County of Suffolk
## The Superior Court

CRIMINAL DOCKET#: **SUCR2001-10384**

RE:     Commonwealth v Robinson, Leon

TO:     Mark T Lee, Esquire
Suffolk County District Atty's Office
1 Bulfinch Place
3rd floor
Boston, MA 02114-2997

_____

### NOTICE OF DOCKET ENTRY

You are hereby notified that on 02/03/2004 the following entry was made on the above referenced docket:

**MEMORANDUM, FINDINGS & ORDERS denying Defendant's Motions to Suppress Evidence (Paper #s 81; 67; 52; 53; 54 and 49, 68, 83), filed by the Court (Walker, J.) (February 03, 2004)**

Dated at Boston, Massachusetts this 3rd day of February, 2004.

John A. Nucci,
Clerk of the Court

Assistant Clerk

Telephone: 617-788-8101

*Check website as to status of case: **http://ma-trialcourts.org/tcic***